UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

JAMES H. DEVLIN,

                            Plaintiff,

         -against-

GARY STEINBERG, MITCHELL STEINBERG,
RICHARD ALLEN OROFINO and CROSSTEX
INTERNATIONAL, INC.,

                        Defendants.

------------------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 0 8 2007 ★

Civil Action No. BROOKLYN OFFICE

Civil Action No.

**COMPLAINT**

**TRIAL BY JURY DEMANDED**

**07    1902**

WEXLER, J. TOMLINSON, M.

      Plaintiff James H. Devlin ("Devlin"), by his undersigned attorneys, as and for his

Complaint against Defendants Gary Steinberg, Mitchell Steinberg, Richard Allen Orofino and

Crosstex International, Inc. alleges as follows upon knowledge as to himself and his own acts

and based upon his attorneys' investigation as to all other matters:

      1.    Plaintiff Devlin is a former member and twenty-five (25%) percent owner of

Crosstex Medical LLC ("Crosstex Medical") which was a closely held New York Limited

Liability Company engaged in the sale and distribution of disposable paper and related products

for the medical industry.  Devlin brings this action because he was defrauded into signing a

dissolution agreement on or about March 1, 2005 pursuant to which Crosstex Medical was

dissolved as part of the defendants' fraudulent scheme to recapture the assets they had

contributed to that company approximately one year earlier in order to be in a position to sell

those assets together with their interests in Crosstex International, Inc. ("Crosstex

International") to a third-party.

1

2.      In connection with the defendants' scheme to defraud and mislead Devlin into agreeing to dissolve Crosstex Medical, and continuing through on or about March 15, 2005 when he signed the agreement dated as of the 1st day of March, 2005 dissolving the company, the individual defendants advised Devlin that Crosstex Medical was not commercially viable for a variety of reasons, including that its margins were too low, the cost of machinery was too high and restrictions imposed on the defendants by certain banking covenants. In January, 2005, at a meeting held in Hauppauge, New York the individual defendants jointly advised Devlin that because of these factors they were not prepared to invest any additional funds in Crosstex Medical for two or three years. In fact, at the time Devlin was being so mislead, defendants Gary Steinberg, Mitchell Steinberg and Richard Allen Orofino had, unbeknownst to Devlin, already commenced negotiations to sell Crosstex International and the related product lines and other assets of Crosstex Medical.

3.      Devlin was therefore shocked to learn on or about August 3, 2005, approximately five months after he signed the documentation dissolving Crosstex Medical, of the public announcement that Cantel Medical Corp., ("Cantel Medical"), as part of its plan to expand its infection prevention and control business, had agreed to acquire Crosstex International from the individual defendants and certain members of their immediate families. Press reports of the announcement stated that Cantel Medical had agreed to pay approximately $74 million plus a further $12 million potential earn out payable to Messrs. Steinberg, Steinberg and Orofino over three years based on operating results. Upon information and belief, the earn out attributable to the first year's operating results has already been paid.

2

4.     The press reports of Cantel Medical's acquisition further stated that the individual defendants each entered into lucrative three-year employment agreements with Cantel Medical.

5.     The true facts regarding the value of the Devlin's ownership interest in Crosstex Medical were concealed from Devlin in order to induce him to agree to dissolve the company. At the time Devlin agreed to dissolve Crosstex Medical in early March, 2005, the individual defendants were aware of but failed to disclose to Devlin the following facts:

- They had formulated a plan to restructure, sell or to be acquired by another company and had already had discussions in furtherance of their plan.

- The defendants or their duly authorized representatives had met with or provided information to Holbrook & Company, LLC an investment banking firm.

6.     Had Devlin been aware or advised of these facts, and therefore the true value of his ownership interest in Crosstex Medical, he would not have agreed to its dissolution nor to accept the return of his modest capital contribution to relinquish his interest in the company in exchange for the individual defendants receiving the goodwill and all rights, title and interest to Crosstex Medical's customers, which they shortly thereafter sold to Cantel Medical.

## PARTIES

7.     Plaintiff Devlin is a citizen and resident of Michigan, with a place of residence at 2052 Pondway Drive, Troy, Michigan 48098.

8.     Upon information and belief, defendant Gary Steinberg is a resident of the State of New York with a place of residence at 6 Cypress Drive, Woodbury, New York 11797.

9.     Upon information and belief, defendant Mitchell Steinberg is a resident of the State of New York with a place of residence at 85 Coves Run, Oyster Bay Cove, New York 11791. Mitchell Steinberg is the brother of defendant Gary Steinberg.

10.    Upon information and belief, defendant Richard Allen Orofino a/k/a Frank A. Orofino is a resident of the State of New York with a place of residence at 271 Asharoken Avenue, Northport, New York 11768. (Richard Allen Orofino, Gary Steinberg and Mitchell Steinberg will at times be referred to as the "Individual Defendants").

11.    Upon information and belief, defendant Crosstex International, Inc. is a corporation formed under and existing pursuant to the law of the State of New York with its principal place of business at 10 Ranick Road, Hauppauge, New York 11788. Following the sale to Cantel Medical of all the issued and outstanding shares of Crosstex International on or about August 1, 2005, Crosstex International has operated as a wholly owned subsidiary of Cantel Medical, a Delaware corporation with its principal place of business at 150 Clove Road, Little Falls, New Jersey 07424.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) as there is complete diversity of citizenship between the plaintiff and defendants and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

13.    Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(a) as the Individual Defendants reside in this district. Venue is also proper pursuant to the Dissolution Agreement dated as of March 1, 2005 between plaintiff and the Individual Defendants, described more fully herein, pursuant to which the parties irrevocably consented to the

jurisdiction of the courts of the State of New York located in Nassau County and the federal

court encompassing such State and County in connection with any action or proceeding arising

out of or relating to said agreement, any document or instrument delivered pursuant to, in

connection with or simultaneously with the agreement, or a breach of the agreement or any such

document or instrument.

## FACTS RELATING TO ALL CLAIMS

14.     In or about February, 2003, Devlin was approached by Gary Steinberg and

Mitchell Steinberg to discuss the formation of a company that would deal in disposable paper

products for the medical industry.  The Steinbergs advised Devlin that Crosstex International

had less than $5,000,000 of annual sales of disposable paper products to the medical industry

and lacked the knowledge and contacts that were needed to increase such sales, including with

various customers with whom Devlin had previously dealt.  At the time he was approached by

the Steinbergs, Devlin had thirty years of executive experience in the paper industry, including

twenty years experience with disposable paper products in the medical industry.

15.     On or about March 15, 2004, Devlin and the Individual Defendants formed

Crosstex Medical.  Each of the foregoing was denominated a Manager and owned twenty-five

(25%) percent of the Company.  Prior to the formation of Crosstex Medical, the Individual

Defendants had for a number of years owned a controlling interest in Crosstex International and

had developed a confidential business and personal relationship.  The Individual Defendants

continued to maintain their respective interests in Crosstex International, as well as their

confidential business and personal relationships, after the formation of Crosstex Medical.

16.     On or about March 15, 2004, Devlin and the Individual Defendants entered into

a Members' Operating Agreement for Crosstex Medical (the "Crosstex Medical Operating

Agreement"), a copy of which is annexed hereto as Exhibit 1. Pursuant to the Crosstex Medical

Operating Agreement, each of the four individuals was deemed an Initial Member and an Initial

Manager.

17.    The Crosstex Medical Operating Agreement stated that Crosstex Medical's

purpose was to engage in the business of the production, sale and distribution of disposable

medical paper products and related products to the medical market or such other activities and

transactions as the Managers deem necessary or advisable. The disposable paper products to be

sold by Crosstex Medical were either to be manufactured on its own equipment, purchased

from Crosstex International or purchased from third-parties.

18.    Paragraph 6.1(a)(iii) of the Crosstex Medical Operating Agreement provided that

the unanimous vote of the four managers would be required for the liquidation or dissolution of

the company, the sale, transfer or other disposal of all or substantially all of its assets, or the

merger, consolidation or other reorganization of the company.

19.    Paragraph 6.5 of the Crosstex Medical Operating Agreement provided that the

Managers shall not take or cause the Company to take any of the following actions without first

obtaining the unanimous written consent of the Members:

(i)    Dissolve the Company;

(ii)   Effect a merger or a consolidation of the Company with or into another entity; or

(iii)  Sell, exchange, lease, mortgage, pledge or otherwise transfer all or substantially

       all of the assets of the Company.

20.    The Crosstex Medical Operating Agreement required Devlin to perform the

following services:

(i)    Devote his full business time and attention to the affairs of Crosstex Medical;

6

(ii)    Develop sales and marketing strategies for Crosstex Medical's products;

(iii)    Develop personal relationships with key executives of other companies engaged in the medical field;

(iv)    With the unanimous consent of the Managers, develop and train commissioned sales representatives where appropriate;

(v)    Advise regarding equipment manufacturing requirements; and

(iv)    Work with advertising and customer service personnel to ensure that new business complied with Crosstex International's reputation.

21.    Devlin faithfully discharged all obligations required of him by the Crosstex Medical Operating Agreement, including meeting with prospective customers for disposable paper products.

22.    In 2004, Devlin obtain verbal commitments for over $15,000,000 of orders for disposable paper products from customers in the medical industry with whom Devlin had enjoyed long-term business relationships.

23.    At no time did any of the Individual Defendants ever criticize or complain about Devlin's efforts or performance on behalf of Crosstex Medical, and he continued to receive the compensation provided for by the Crosstex Medical Operating Agreement.

24.    Starting in or about the late summer of 2004, the Individual Defendants combined and conspired to begin imposing a series of artificial obstacles and proffering excuses that had the effect of thwarting Devlin's further development of Crosstex Medical's business. The Individual Defendants utilized these pretexts in order to disenfranchise Devlin and subsequently induce him to agree to the dissolution of Crosstex Medical.  At the same time the Individual Defendants were surreptitiously proceeding with their plan of selling their disposable

paper products businesses, a plan they knew would vastly increase the value of Devlin's twenty-five percent interest in Crosstex Medical, which interest they wanted for themselves.

25.     In furtherance of the Individual Defendants' scheme directed against Devlin, in the late summer of 2004 Devlin's request for funds to purchase a medical drape machine from Depere Machine Company was put on hold by Richard Allen Orofino citing a lack of funds, litigation brought against the manufacturer and potential loan covenant violations and/or restrictions. In fact, these statements were false and were known to be false when made. Upon information and belief, the amount required to purchase one of these machines was or could have been made available, there was no litigation which prohibited the manufacture of the requested equipment for Crosstex International and the waiver of any loan covenant could, if requested, have been obtained.

26.     Upon information and belief, the false information Richard Allen Orofino imparted to Devlin in the late summer of 2004 was done with the knowledge and approval of Gary Steinberg and Mitchell Steinberg and in furtherance of the Individual Defendants' scheme to defraud Devlin.

27.     In furtherance of the Individual Defendants' scheme directed against Devlin, in or about December, 2004, Mitchell Steinberg informed Devlin not to place the first container order for table paper from a manufacturer located in China pending resolution of certain problems with that manufacturer. Upon information and belief, there were no problems with that manufacturer which prevented the placement of the requested order in December, 2004, a fact known to Mitchell Steinberg at the time he informed Devlin not to place this order.

28.     Upon information and belief, the false information Mitchell Steinberg imparted to Devlin in or about December, 2004 was done with the knowledge and approval of Richard

8

Allen Orofino and Gary Steinberg and in furtherance of the Individual Defendants' scheme to defraud Devlin.

29.     In furtherance of the Individual Defendants' scheme directed against Devlin, in or about December, 2004 and again in or about January, 2005, Gary Steinberg advised Devlin that the margins of Crosstex Medical's products was too low.  In fact, these margins had not changed since they were first presented by Devlin in February, 2003, a fact known to Gary Steinberg in December, 2004 and January, 2005.

30.     Upon information and belief, the false information Gary Steinberg imparted to Devlin in or about December, 2004 and January, 2005 was done with the knowledge and approval of Richard Allen Orofino and Mitchell Steinberg and in furtherance of the Individual Defendants' scheme to defraud Devlin.

**The Fraudulently Induced Dissolution Agreement**

31.     In January, 2005, the Individual Defendants told Devlin at a meeting at Crosstex Medical's office in Hauppauge, New York that they had decided against investing any more money in the company for 2 to 3 years.

32.     Pursuant to agreement dated as of March 1, 2005 a dissolution agreement was entered into by and between Devlin and the Individual Defendants as the four members of Crosstex Medical (the "Dissolution Agreement"), a copy of which is annexed hereto as Exhibit 2.  Devlin signed the Dissolution Agreement in Florida and caused it to be transmitted by his attorney in Michigan to the defendants' counsel in New York.

33.     The Dissolution Agreement provided that, with certain limited exceptions not relevant to this litigation, effective March 1, 2005 Crosstex Medical would cease to engage in

9

any further business activities and that all prior agreements between Devlin and the Individual

Defendants pertaining to the company were cancelled and terminated.

34.     Pursuant to the Dissolution Agreement, $400,000 was sent to Devlin at his

residence in Michigan as payment in full for his interest in Crosstex Medical plus the

reimbursement of approximately $5,250 in out-of-pocket expenses. This payment essentially

represented the return of Devlin's cash capital contribution made approximately one year

earlier, which contribution he wired into a New York bank from Michigan.

35.     Pursuant to the Dissolution Agreement, the Individual Defendants, on behalf of

the Company, assigned to themselves all of Crosstex Medical's right, title and interest in and to:

(i)     its customers and all the goodwill associated therewith, including but not

limited to, those customers the Individual Defendants had previously

assigned to the Company on or about March 15, 2004; and

(ii)    the "Crosstex Medical" name and all of the goodwill associated with such name.

36.     Pursuant to Paragraph 4(a)(ii) of the Dissolution Agreement, the Individual

Defendants agreed that for a period of two years they would not, directly or indirectly, in any

capacity (including but not limited to as a principal, officer, director, employee or otherwise,

alone or in association with any other person, firm or other business organization) engage in the

sale of paper drapes, paper gowns or capes to any person or business who was a customer of

Crosstex Medical or Crosstex International at any time during the preceding two years, subject

only to their right to acquire an entity or substantially all of the assets of an entity which already

manufactured such items.

10

37.     Pursuant to Paragraph 4(a) (iii) of the Dissolution Agreement, the Individual Defendants acknowledged that their obligations under 4(a)(ii) of the agreement were necessary and reasonable to protect Devlin.

38.     The Dissolution Agreement was filed with the New York State Department of State by the defendants' attorney on or about April 3, 2005.

39.     At no time prior to the execution of the Dissolution Agreement was Devlin ever aware or apprised of the fact that the Individual Defendants and/or their representatives had held discussions with or provided information to a prospective purchaser and/or an investment banker concerning a restructuring or sale that would include the assets that prior to the Dissolution Agreement were owned by Crosstex Medical or that negotiations regarding such a transaction were already underway.

**The Undisclosed Sale Talks**

40.     Without ever advising Devlin, and what was unknown by Devlin when he signed the Dissolution Agreement, was that the Individual Defendants had: (i) entered into negotiations to sell Crosstex International as well as the assets that prior to the Dissolution Agreement were owned by Crosstex Medical, and (ii) directly or through their representatives previously met with or provided information to a prospective purchaser and/or the investment banking firm of Holbrook & Company, LLC in connection therewith.

**The Individual Defendants Acted with Scienter**

41.     The foregoing acts of the Individual Defendants were intended to deceive and mislead Devlin and the Individual Defendants acted with scienter. The fraudulent statements and omissions identified herein were intended to and did induce Devlin to sign the Dissolution Agreement in order to terminate his interest in Crosstex Medical. As a result of their

11

misconduct towards Devlin, the Individual Defendants, long-time partners and acquaintances who together with members of their immediate families owned all the stock of Crosstex International, each received according to published reports nearly $25 million from Cantel Medical, a substantial portion of which according to public filings made by Cantel Medical was attributed to goodwill. Accordingly, the Individual Defendants are charged with the knowledge and misrepresentations of each other in furtherance of their common scheme to mislead Devlin into agreeing to dissolve Crosstex Medical in order to obtain for themselves all of Crosstex Medical's right, title and interest in and to its customers and the goodwill associated therewith and to be able to make certain representations they or their advisors knew or reasonably should have known would have to be made in order to sell Crosstex International.

42.     Upon information and belief, following the sale of Crosstex International to Cantel Medical the Individual Defendants have directly or indirectly been engaged in the sale of disposable paper products, including but not limited to paper drapes, paper gowns and/or capes, to persons or businesses that had previously been customers of Crosstex International and/or Crosstex Medical. The foregoing constitutes, inter alia, a breach of the non-competition provision contained in Paragraph 4(a) of the Dissolution Agreement referred to in paragraph 36, supra.

## FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

### (Fraud)

43.     Devlin repeats and realleges paragraphs 1 through 42 with the same force and effect as if set forth at length herein.

44.     In connection with Devlin's execution of the Dissolution Agreement and relinquishment of his twenty-five percent interest in Crosstex Medical, each of the defendants,

12

acting jointly and severally and for a common purpose engaged in acts, practices and a course of business intended to and which operated as a fraud or deceit upon Devlin.

45.     Specifically, as set forth in the preceding paragraphs, the Individual Defendants defrauded Devlin into signing the Dissolution Agreement by failing to disclose to him their intent and purpose of acquiring all of Crosstex Medical's goodwill and rights, title and interest to its customers in order to sell those assets to Cantel Medical, thereby significantly increasing the amount each of the Individual Defendants would receive from the sale.

46.     As is more fully set forth above, prior to the execution of the Dissolution Agreement, the Individual Defendants by virtue of their personal involvement in the events and their positions as officers and/or directors and majority shareholders of Crosstex International and their cumulative seventy-five percent (75%) ownership interest of Crosstex Medical, were aware of the material omissions to Devlin and knew that his twenty-five percent (25%) interest in Crosstex Medical was or would shortly become worth substantially more than the amount he would receive under the Dissolution Agreement.

47.     The Individual Defendants, as shareholders and members of Crosstex Medical, a close corporation, were each under a duty but failed to disclose the material inside information set forth above to Devlin before causing him to enter into the Dissolution Agreement.

48.     Had Devlin known of the material information which the Individual Defendants failed to disclose, Devlin would not have entered into the Dissolution Agreement, which pursuant to Crosstex Medical's Operating Agreement required the unanimous approval of the

four Members, to terminate his interest in Crosstex Medical for the return of his original capital investment.

49.     Devlin reasonably, foreseeably and detrimentally relied on the omissions and the misleading representations as to the lack of any commercially viable future for Crosstex Medical repeatedly made to him by the Individual Defendants, acting in concert, to enter into the Dissolution Agreement.

50.     The fraud perpetrated on Devlin (i) caused him to liquidate his interest in Crosstex Medical significantly for less than he would have if he had known the truth concerning the defendants' omissions, and (ii) deprived him of the opportunity to participate in and profit from the acquisition by Cantel Corporation.

51.     Based on the defendants' fraudulent and deceptive actions, as described above, Devlin has been damaged in an amount not presently ascertainable, but believed to be in excess of eight million ($8,000,000) dollars.

## SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS

### (Fraudulent Concealment)

52.     Devlin repeats and realleges the allegations in paragraphs 1 through 51 with the same force and effect as if set forth at length herein.

53.     The defendants had superior knowledge of, among other things, the negotiations with Cantel Corporation or other potential investors, acquirers or merger partners and knew that Devlin was unaware of those facts. As shareholders and members of Crosstex Medical, a close corporation, the Individual Defendants owed a duty to Devlin to disclose all material facts to him, including but not limited to the duty to do so in connection with the negotiations of the Dissolution Agreement.

14

54.     Despite their duty to do so, the Individual Defendants failed to disclose to Devlin the negotiations with Cantel Corporation, acquirers or merger partners or their true intent and purpose in seeking to dissolve Crosstex Medical in early 2005.

55.     In failing to make these facts known to Devlin, the defendants, as set forth above, knowingly and intentionally sought to defraud Devlin into relinquishing his interest in Crosstex Medical in exchange for the return of his capital contribution while the defendants received far more valuable assets that were shortly thereafter sold to Cancel Medical.

56.     The above-described fraudulent actions of the defendants were willful, wanton, and intended to deceive Devlin and entitle him to recover punitive damages.

57.     By reason of the foregoing, as a result of having entered into the Dissolution Agreement, Devlin has been damaged in an amount not presently ascertainable, but believed to be in excess of eight million ($8,000,000) dollars.

## THIRD CAUSE OF ACTION AGAINST DEFENDANTS
## GARY STEINBERG, MITCHELL STEINBERG AND RICHARD ALLEN OROFINO

### (Breach of Fiduciary Duty)

58.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 57 with the same force and effect as if set forth at length herein.

59.     The Individual Defendants, as members, directors, officers, managers and equal twenty-five percent owners of Crosstex Medical with Devlin each and jointly owned fiduciary duties to Devlin. Among these fiduciary duties was the duty to inform Devlin of all material facts concerning the present or reasonably anticipated value of his twenty-five (25%) percent interest in Crosstex Medical prior to causing Devlin to enter into the Dissolution Agreement.

15

60.    The Individual Defendants, jointly and severally, breached their respective fiduciary duties to Devlin by failing to inform him that their true intent and purpose in seeking to dissolve Crosstex Medical in early 2005 was to obtain for themselves all of Crosstex Medical's right, title and interest in and to its customers and all of the goodwill associated therewith in order to sell these assets to Cantel Medical without Devlin receiving what he was entitled to.

61.    By reason of the foregoing, as a result of having entered into the Dissolution Agreement, Devlin has been damaged in an amount not presently ascertainable, but believed to be in excess of eight million ($8,000,000) dollars.

## FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS GARY STEINBERG, MITCHELL STEINBERG AND RICHARD ALLEN OROFINO

### (Unjust Enrichment)

62.    Devlin repeats and realleges paragraphs 1 through 61 with the same force and effect as if fully set forth at length herein.

63.    A portion of the proceeds received and/or to be received by the defendants from Cantel Medical was attributable to the assets of Crosstex Medical transferred to the Individual Defendants pursuant to the Dissolution Agreement Devlin was defrauded into signing.

64.    Under the circumstances described herein, it would be inequitable and unjust for the Individual Defendants to retain such proceeds.

65.    By reason of the foregoing, Devlin is entitled to his share of the sale proceeds received or to be received by the Individual Defendants attributable to the assets of Crosstex Medical transferred to them pursuant to the Dissolution Agreement Devlin was defrauded into signing.

16

## FOR A SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS GARY STEINBERG, MITCHELL STEINBERG AND RICHARD ALLEN OROFINO

### (Imposition of Constructive Trust)

66.     Devlin repeats and realleges paragraphs 1 through 65 with the same force and effect as if set forth at length herein.

67.     A portion of the proceeds received and/or to be received by the Individual Defendants from Cantel Medical is attributable to the assets of Crosstex Medical transferred to them pursuant to the Dissolution Agreement Devlin was defrauded into signing.

68.     Under the circumstances described herein, it would be inequitable and unjust for the Individual Defendants to retain such proceeds.

69.     By reason of the foregoing, Devlin is entitled to have a constructive trust impressed on the sale proceeds received or to be received by the Individual Defendants attributable to the assets of Crosstex Medical transferred to them pursuant to the Dissolution Agreement Devlin was defrauded into signing.

## FOR A SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

### (Interference with Prospective Economic Advantage)

70.     Devlin repeats and realleges paragraphs 1 through 69 with the same force and effect as if set forth at length herein.

71.     Devlin had a reasonable expectation of economic benefit from a continuing relationship with Crosstex Medical.

72.     The Individual Defendants knowingly and falsely represented to Devlin that Crosstex Medical was not commercially viable.

73.     By the conduct previously set forth herein, the Individual Defendants

17

intentionally and maliciously interfered with Devlin's economic expectancy.

74.     Absent such interference there is a reasonable probability that Devlin would have received his anticipated economic benefit.

75.     By reason of the foregoing, as a result of having entered into the Dissolution Agreement, Devlin has been damaged in an amount not presently ascertainable, but believed to be in excess of eight million ($8,000,000) dollars.

## FOR A SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS GARY STEINBERG, MITCHELL STEINBERG AND RICHARD ALLEN OROFINO

### (Attorneys' Fees and Expenses)

76.     Devlin repeats and realleges paragraphs 1 through 75 with the same with the same force and effect as if set forth at length herein.

77.     Paragraph 8(d) of the Dissolution Agreement provides in pertinent part:

> "If any dispute arises between the parties with respect to the matters covered by this Agreement, the prevailing party in such proceeding shall be entitled to receive its reasonable attorneys' fees, expert witness fees and out-of-pocket costs incurred in connection with such proceeding, in addition to any other relief it may be awarded."

78.     By reason of the foregoing, Devlin is entitled to the reasonable attorneys' fees, expert witness fees and out-of-pocket costs incurred in connection with this litigation.

**WHEREFORE,** the Plaintiff requests judgment as follows:

(i)     On the First Cause of Action against all Defendants, jointly and severally, awarding damages in an amount not presently ascertainable, but believed to be in excess of eight million ($8,000,000) dollars, together with interest thereon;

18

(ii)    On the Second Cause of Action against all Defendants, jointly and severally, awarding damages in an amount not presently ascertainable, but believed to be in excess of eight million ($8,000,000) dollars, punitive damages in an amount not less than three times the amount of compensatory damages awarded, together with interest thereon;

(iii)    On the Third Cause of Action against Defendants Gary Steinberg, Mitchell Steinberg and Richard Allen Orofino, jointly and severally, awarding damages in an amount not presently ascertainable, but believed to be in excess of eight million ($8,000,000) dollars, together with interest thereon;

(iv)    On the Fourth Cause of Action against Defendants Gary Steinberg, Mitchell Steinberg and Richard Allen Orofino, jointly and severally, awarding damages in an amount not presently ascertainable, but believed to be in excess of eight million ($8,000,000) dollars, together with interest thereon;

(v)    On the Fifth Cause of Action against Defendants Gary Steinberg, Mitchell Steinberg and Richard Allen Orofino, jointly and severally, imposing a Constructive Trust on the proceeds received or to be received by defendants attributable to the proceeds of the sale of the assets of Crosstex Medical;

(vi)    On the Sixth Cause of Action against all Defendants, jointly and severally, awarding damages in an amount not presently ascertainable, but believed to be in excess of eight million ($8,000,000) dollars, together with interest thereon;

(vii)    On the Seventh Cause of Action against defendants Gary Steinberg, Mitchell Steinberg and Richard Allen Orofino, jointly and severally, all attorneys' fees, expert witness fees and out-of-pocket costs incurred in connection with this litigation.

(viii)Awarding punitive damages against all Defendants in an amount to be determined

by the trier of fact; and

      (ix)   For such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a jury trial of all claims for relief that may be tried before a jury.

Dated: New York, New York
       May 8, 2007

                 SNOW BECKER KRAUSS P.C.

                 By _____
                     Ronald S. Herzog (RH-4932)
                 605 Third Avenue
                 New York, New York 10158
                 (212) 687-3860

                 *Attorneys for Plaintiff James H. Devlin*

Exhibit 1

# CROSSTEX MEDICAL LLC
## MEMBERS' OPERATING AGREEMENT

March 15, 2004

# CROSSTEX MEDICAL LLC

## OPERATING AGREEMENT

THIS OPERATING AGREEMENT (the "Agreement"), is made and entered into as of March 15, 2004, by and among **James H. Devlin** ("Devlin"), **Richard Allen Orofino** ("Orofino"), **Mitchell Steinberg** ("M. Steinberg") and **Gary Steinberg** ("G. Steinberg" and, together with Orofino and M. Steinberg, sometimes hereinafter referred to as the "L.I. Members" and the L.I. Members, together with Devlin are sometimes hereinafter referred to as the "Initial Members"), and all of those persons and/or entities who may hereinafter be admitted as members of **Crosstex Medical LLC**, a New York Limited Liability Company (hereinafter "MEDICAL" or the "Company," with each such person, trustee, and/or entity being hereinafter referred to individually as a "Member" and collectively as the "Members"), all of whom agree as follows:

### WITNESSETH:

**WHEREAS**, prior to the date of this Agreement, the Initial Members have engaged in extensive discussions regarding the formation of MEDICAL, a business venture to be established by the Members to engage in the business of the production, sale and distribution of disposable medical paper products and related products, as more particularly described in Section 2.1 of this Agreement (the "Business"); and

**WHEREAS**, the Members propose that the joint venture take the form of a limited liability company organized pursuant to the provisions of the New York Limited Liability Company Law (the "LLCL") to be named CROSSTEX MEDICAL LLC; and

**WHEREAS**, the Members are desirous of making specific provisions for the ownership, operation, and management of MEDICAL.

**NOW, THEREFORE** in consideration of the premises contained herein and the benefits to be derived by each party hereto from the mutual covenants and agreements hereinafter set forth, the Members, intending to be legally bound, do hereby covenant and agree as follows:

### Article 1
### Organization

1.1     Formation: The parties to this Agreement hereby form the Company pursuant to the LLCL by the filing of Articles of Organization ("Articles") as required by the LLCL.

1.2     Name:  The name of the Company is *Crosstex Medical LLC*.  The Company may also conduct its business under one or more assumed names.

---

1.3     <u>Principal Office</u>: The principal office and headquarters of the Company shall be at 10 Ranick Road, Hauppauge, New York 11788 or at such other place as the Managers may, from time to time, determine (the "Principal Office").

1.4     <u>Classification for Income Tax Purposes</u>: The Members acknowledge and agree that they intend that the Company be classified as a "partnership" for income tax purposes and shall do such reasonable things, including, but not limited to, making any appropriate filings as are necessary to secure such classification. No Member shall make any election or other filing with any taxing or governmental authority (including, but not limited to, an election or filing pursuant to Treasury Regulation §301.7701-3) which would cause the Company to be classified as an association taxable as a corporation for federal income tax purposes.

1.5     <u>Duration</u>: The Company shall commence its existence at the time of the filing of the Articles of Organization in the Office of the Secretary of State of New York (the "Effective Date"), and shall continue in existence for the period of duration set forth in the Articles or until the Company dissolves and its affairs are wound up in accordance with the LLCL or this Operating Agreement.

## Article 2
## Purposes and Powers

2.1     <u>Purposes</u>: The purposes of the Company shall be (i) to engage in the production, sale and distribution of those disposable medical paper products ("Medical Products") to be sold to the medical market, all of which shall be manufactured by the Company on its own equipment, shall be purchased directly from Crosstex International Corporation ("Crosstex"), a New York corporation whose principal shareholders include the L.I. Members, or shall be purchased from third parties and (ii) to conduct such other activities and transactions as the Managers deem necessary or advisable to promote the Business. The parties acknowledge that Crosstex, among other things, engages in the production, sale, and distribution of disposable products and other related products for the dental and other industries ("Non-Medical Products") and that it is not the intention of the parties that the business of the Company extend beyond the medical market or otherwise compete with the business of Crosstex. The parties acknowledge that Crosstex may sell Medical Products to customers a majority of whose revenues, as of the date hereof, are derived from the sale of Non-Medical Products as well as to certain of its existing customers as set forth in a list to be provided by Crosstex to the Company contemporaneously herewith.

2.2     <u>No Other Business</u>. The Company shall participate in no other business other than that set forth in Section 2.1 hereof.

2.3     <u>Powers</u>. The Company shall have all the powers necessary or convenient to effect such purpose for which it is formed, including all powers granted by the LLCL.

2

## Article 3
## Capital Contributions, Membership Interests, Capital Accounts and Member Loans

3.1     <u>Contributions to Capital</u>.  The Members shall each be responsible for twenty-five (25%) percent of the capital contribution to the Company ("Capital Contribution").  The Members have made or shall make, as the case may be, contributions to the capital of the Company upon the following terms and conditions:

(a)     For their initial capital contribution, Orofino, M. Steinberg and G. Steinberg shall contribute their knowledge, expertise, experience, good will and contacts in the medical industry, such contribution having an agreed upon value of One Million Six Hundred Thousand ($1,600,000) Dollars.

(b)     For his initial capital contribution, Devlin shall contribute Three Hundred Seventy Five Thousand ($375,000) Dollars in cash within five (5) business days of the Effective Date.

3.2     <u>Membership Interests</u>.  In consideration of each Member's contribution to capital, each Member shall be issued Membership Interests (as defined in the LLCL) in the Company, reflecting such Member's percentage of the total Capital Contribution.

| Member | Membership Interests | Ownership Percentage |
|---|---|---|
| James H. Devlin | 250 | 25% |
| Richard Allen Orofino | 250 | 25% |
| Mitchell Steinberg | 250 | 25% |
| Gary Steinberg | 250 | 25% |

3.3     <u>Members' Capital Accounts</u>:

(a)     The Company shall establish and maintain a separate capital account (the "Capital Account") for each Member.  Each Capital Account shall be:

(i)     increased by (i) the amount of cash and the fair market value of any property (net of any liabilities secured by the property that the Company assumes or takes subject to) that the Member contributes and (ii) the amount of Profits (or items of income or gain) allocated to such Member; and (iii) the amount of any Company liabilities that are assumed by such Member other than liabilities that are secured by any Company property distributed to such Member by the

3

Company as provided in Treas. Reg. 1.704-1(b)(2)(iv)(c)(i); and

      (ii)    decreased by (i) the amount of any cash and the fair market value of any property (net of any liabilities secured by the property that the Member assumes or takes subject to) distributed to the Member, (ii) the amount of Losses (or items of loss or deduction allocated to such Member; and (iii) any expenditures described in IRC 705(a)(2)(B).

      (b)    If a Member's Membership Interests, or any portion of them, are transferred in accordance with this Operating Agreement, the transferee shall succeed to the Capital Account of the transferring Member or to any portion that is transferred.

      (c)    All of the provisions above regarding the establishment and maintenance of Capital Accounts are intended to comply with Treas Reg 1.704-1(b)(2)(iv) and shall be interpreted and applied in order to comply with this Treasury Regulation. The Members further agree to make any adjustments to the Capital Accounts that may be necessary or appropriate to comply with the Treasury Regulation.

      3.4    <u>Additional Contributions by Members</u>: Upon the unanimous agreement of the Managers that additional capital is required (the "Additional Capital Contribution"), each of the Members shall be required to make such Additional Capital Contribution in accordance with his pro rata share of the Company. The foregoing to the contrary notwithstanding, in the event that a majority of the Managers call for Additional Capital Contributions from the Members and a Member does not contribute his pro rata share of the Additional Capital Contribution within thirty (30) days of the call therefore, then the ownership percentage of the contributing Members shall be increased proportionately based upon the increased value of the Company after giving effect to the Additional Capital Contribution. For purposes of this Section 3.4, the "value" of the Company shall be determined by reference to all Capital Contributions and Additional Capital Contributions theretofore made.

      3.5    <u>Restrictions Relating to Capital Accounts</u>. Except as otherwise expressly provided in this Operating Agreement or under the LLCL, no Member shall have the right to:

      (a)    have priority over any other Member either as to the return of his Capital Contribution or as to Distributions: or

      (b)    withdraw or reduce his Capital Contribution; or

      (c)    demand or receive any interest on his Capital Account; or

      (d)    the return of any contributions to the Company or on the Member's Capital Account; or

      (e)    any interest, right or claim in or to any of the Company's assets

4

provided that, however, in the event of a dissolution of the Company, the L.I. Members shall, as part of the Distributions to which they are entitled under Section 11.2(d) hereof, be entitled to the return of any of the Company's business having a dental component. In other words, if the Company is dissolved, then as part of the dissolution, the Company will assign to the L.I. Members all of the Company's contracts and rights to do business with those customers ("L.I. Customers"), (i) a portion of whose business with the Company consists of the purchase of products for the dental market, or (ii) who at any time were customers of Crosstex, and the goodwill associated therewith. In furtherance of this, Devlin agrees that in the event of a dissolution, the restrictive covenants contained in Section 8.1 shall apply to Devlin with respect to such L.I. Customers.

     3.6   <u>Issuance of Additional Membership Interests</u>:  The Company may, upon the unanimous consent of the Initial Members, issue additional Membership Interests for such consideration as permitted by the LLCL.  Any purchaser of Membership Interests from the Company shall become a Member of the Company after executing an amendment to this Operating Agreement, agreeing to be bound by all of the terms and provisions of this Operating Agreement, and satisfying any other conditions of Membership as the Company may require.

**Article 4**
**Books, Records, Accounting and Tax Matters**

     4.1   <u>Books and Records</u>:  At all times during its existence, the Company shall keep, or cause to be kept, at the Company's principal place of business, full and true books and records reflecting each of the Company's transactions.

     (a)   The books and records shall include, but not be limited to:

     (i)   a list of the names and addresses of each Member;

     (ii)   a copy of the Articles of the Company and all amendments thereto or restatements thereof;

     (iii)   a copy of this Operating Agreement and any amendments thereto and any amended and restated operating agreements;

     (iv)   a copy of the Company's financial statements and federal, state, and local income tax returns and reports for the three most recent fiscal years; and

     (v)   any records with respect to a Member's Capital Contribution and the share of profits and losses of each Member or any information from which such share can be readily derived.

     (b)   The books and records shall be open to reasonable inspection and examination by the Members or their duly authorized representatives at the Company's registered office, during reasonable business hours, on reasonable notice to the Company.

4.2    <u>Reports</u>: The Company shall endeavor to furnish to each Member, within sixty (60) days after the end of each fiscal year, or as soon as practical thereafter, an annual report of the Company's business and operations during the year, together with such information as may be necessary for the preparation of each Member's federal and state income or other tax returns. The annual report shall contain a copy of the Company's annual financial statement showing the Company's (a) gross receipts and expenses, (b) profit or loss, and (c) the allocations of them to each Member for the year.

4.3    <u>Accounting</u>:

(a)    <u>Fiscal Year</u>:  The Company's fiscal year shall be the calendar year.

(b)    <u>Accountants</u>:  The Company may engage certified public accountants to assist in the preparation of the Company's books and financial statements and to render any other services the Company requests.

(c)    <u>Accounting Method</u>:  The Company's books and records shall be kept on the accounting method selected by the Managers and any financial statements of the Company shall be prepared in accordance with generally accepted accounting principles.

(d)    <u>Allocation of Expenses with Crosstex</u>:  The L.I. Members shall cause Crosstex to provide certain services and materials to the Company including, but not limited to, administrative services, raw materials and inventory pursuant to the term of the Management Services and License Agreement (the "Management Agreement") to be entered into by Crosstex and the Company contemporaneously herewith.  The costs and expenses of such services and materials shall be allocated to the Company in accordance with the Management Agreement.

4.4    <u>Bank Accounts</u>:  All funds of the Company shall be held in the Company's name in one or more Company bank accounts.  The Managers shall determine the institution or institutions at which the accounts will be opened and maintained and the types of accounts.  Checks shall be drawn upon the Company's account(s) only for the purposes of the Company and may be signed by any Manager.

4.5    <u>Tax Matters Member; Member Tax Returns</u>

(a)    As used in this Operating Agreement, *Tax Matters Member* has the same meaning as the term *tax matters partner* set forth in IRC 6231(a)(7).  Orofino is designated the Company's Tax Matters Member.

(b)    Each Member shall reflect on his or her individual income tax return all items of income, gain, loss, deduction, or credit relating to the Company, its property, or its business in a manner that is consistent with the treatment of such items on the Company returns.

6

## Article 5
## Allocations and Distributions

5.1     Allocation of Profits and Losses:

(a)     After the application of the regulatory and/or other allocations described in this Agreement, the Profits and Losses for each fiscal shall be allocated among the Members in accordance with their percentage of Membership Interest.

(b)     Definitions: For the purposes of this Agreement, "Profits" and "Losses" shall be defined as, for each fiscal year or period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with IRC 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to IRC 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)     Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(ii)     Any expenditures of the Company described in IRC 705(a)(2)(B) or treated as IRC 705(a)(2)(B) expenditures pursuant to Treas. Reg. 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(iii)     Gain or loss resulting from any disposition of a Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the gross asset value of the property disposed of, notwithstanding that the adjusted basis of such property differs from its gross asset value;

(iv)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation for such fiscal year or other period; and

(v)     Notwithstanding any other provisions of this Section, any items which are specifically allocated under the terms of this Agreement shall not be taken into account in computing Profits and Losses.

5.2     Regulatory Allocations: The following regulatory allocations apply:

(b)     *Minimum-Gain Chargeback.* To the extent and in the manner required by Treas Reg 1.704-2(f), if there is a net decrease in Company Minimum Gain for any fiscal year, each Member shall be allocated items of Company income or gain for such fiscal year (and, if necessary, succeeding fiscal years) equal to such Member's share of the net decrease in Company

7

Minimum Gain determined under Treas Reg 1.704-2(g). This Section shall be interpreted and applied in a manner consistent with the minimum-gain chargeback requirements of Treas Reg 1.704-2(f).

(c) *Member Minimum-Gain Chargeback.* To the extent and in the manner required by Treas Reg 1.704-2(i)(4), if there is a net decrease in Member Minimum Gain, each Member with a share of Member Minimum Gain shall be allocated items of Company income and gain for such fiscal year (and, if necessary, succeeding fiscal years) in an amount equal to the Member's share of the net decrease in Member Minimum Gain. The items to be allocated shall be determined in accordance with Treas Reg 1.704-2(f)(6). This Section shall be interpreted and applied in a manner consistent with the minimum-gain chargeback requirement of Treas Reg 1.704-2(i)(4).

(d) *Qualified Income Offset.* Any Member who unexpectedly receives any adjustment, allocation, or distribution described in Treas Reg 1.704-1(b)(2)(ii)(d)(4), (5), or (6) shall be allocated items of Company income and gain (consistent with a pro rata portion of each item of income, including gross income, and gain for such fiscal year) in an amount and manner sufficient to eliminate, as quickly as possible, any deficit in the Member's Capital Account.

(e) *Company Nonrecourse Deductions.* Any Company Non-recourse Deductions shall be allocated among the Members in accordance with Treas Reg 1.704-2(e).

(f) *Member Nonrecourse Deductions.* Member Nonrecourse Deductions shall be allocated to the Members who bear the economic risk of loss with respect to the Member Nonrecourse Debt to which Member Nonrecourse Deductions are attributable. This Section shall be interpreted and applied in a manner consistent with Treas Reg 1.704-2(i)(1).

5.3 <u>Allocations Regarding Contributed Property</u>: Items of income, gain, loss, and deduction with respect to any property contributed to the Company by any Member shall be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its value for Capital Account purposes, in accordance with IRC 704(c) and the Treasury Regulations promulgated thereunder. If the value of the property is later adjusted, subsequent allocations of income, gain, loss, and deduction with respect to the property shall be made in accordance with any method permitted by IRC 704(c) and the Treasury Regulations promulgated under it.

5.4 <u>Definitions</u>: For purposes of this Operating Agreement, the following definitions shall apply:

(b) *Company Nonrecourse Deductions* has the same meaning as that term in Treas Reg 1.704-2(b)(1).

(c) *Member Nonrecourse Deductions* has the same meaning as that term in Treas Reg 1.704-2(i)(2).

8

(d)     *Member Nonrecourse Debt* has the same meaning as that term in Treas Reg 1.704-2(b)(4).

(e)     *Member Minimum Gain* means an amount, with respect to any Member Nonrecourse Debt, as determined in accordance with Treas Reg 1.704-2(i)(3).

(f)     *Company Minimum Gain* has the same meaning as that term in Treas Reg 1.704-2(b)(2), (d).

5.5     Interpretation:  The Members intend that the allocations of the Company's Profits and Losses shall be applied in a manner consistent with IRC 704 and the Treasury Regulations promulgated under it. The provisions of this Article 5 shall be interpreted in a manner consistent with IRC 704 and the Treasury Regulations promulgated under it.

5.6     Distributions:

(a)     General:  The Managers shall have discretion as to the amount and timing of and distributions of cash flow made to Members with respect to any fiscal year of the Company ("Distributions") subject to the Sections 5.6(b) and 5.6(c) hereof.

(b)     Cash Available for Distribution:  The Company shall, in the reasonable judgment of the Managers acting unanimously, retain from cash flow such funds as are necessary to cover its reasonable business needs, which shall include reserves against possible Losses and the payment or making provision for the payment, when due, of obligations of the Company.  Any remaining funds shall be available for distribution.

(c)     Sequence and Priority of Distributions.  Subject to the provisions of Section 11 hereof, Distributions to the Members shall be made as follows:

(i)     First, to pay an annual amount equal to Two Hundred Thousand ($200,000) Dollars payable in equal monthly installments to Devlin as compensation for services rendered pursuant to Section 7 of this Operating Agreement;

(ii)     Second, to pay to Crosstex the Management Fee pursuant to the Management Agreement;

(iii)     Third, to pay an annual amount equal to Two Hundred Thousand ($200,000) Dollars in equal monthly payments to the L.I. Members, such amount to be equally distributed among them;

(iv)     Fourth, any remaining Profits shall be allocated among the parties in accordance with their pro rata share, provided, however, that to the extent of available cash flow, the Managers shall cause the Company to distribute cash in respect of Profits, on an annual

9

basis, in an amount not less than that required by the Members to pay their Federal, State and local income taxes in respect of their proportionate share of the Profits.

(d)     In any event, no Distribution shall be declared or made if, after giving it effect, the Company would not be able to pay its debts as they become due in the usual course of business or the Company's total assets would be less than the sum of its total liabilities.  In the event that the Company's cash flow is insufficient to pay any amounts due pursuant to Sections 5.6(c)(i), (ii) or (iii), then any amounts due and owing thereunder shall accrue, but shall not be paid, until the Company's cash flow is sufficient to make such payments.  Without limiting the foregoing, the parties acknowledge and agree that the payment of Devlin's compensation pursuant to Section 5.6©(i) hereof is not "guaranteed".

## Article 6
## Management

6.1     Management of Company:  Subject to the limitations set forth in Section 6.5, the business and affairs of the Company shall be managed by and under the authority of the Manager or Managers appointed by the Members.  Approval by or action taken by the Managers in accordance with this Agreement shall constitute approval or action by the Company and shall be binding on the Members.  Each Manager shall perform the duties and undertake the responsibilities set forth in this Agreement, and exercise reasonable, diligent and efficient business administration consistent with customary administration of business enterprises comparable to the Company.     .

(a)     Managers:

(i)     Number of Managers:  There shall be not less than one or more than ten Managers.

(ii)     Initial Managers:  The initial Managers shall be:

a.     James H. Devlin
b.     Richard Allen Orofino
c.     Mitchell Steinberg
d.     Gary Steinberg

(iii)     Voting on Matters of Significance:  The Managers shall act by unanimous vote, with each Manager having one vote, on all of the following matters: (w) the sale or issuance of any additional Membership Interests or any warrants, options or other rights to acquire, or any notes or other instruments convertible into, such Membership Interests; (x) the liquidation or dissolution of the Company; (y) the sale, transfer or other disposal of all or substantially all of its assets; or (z) the merger, consolidation or other reorganization of the Company.

(iv)     Appointment and Removal:  No Manager shall be appointed or removed without the unanimous vote of all of the Members.  Each Manager shall serve until (i) his

10